**FIREMAN'S FUND INSURANCE COMPANY as subrogee to Arkin Medo, Inc., Plaintiff,**

v.

**ADT SECURITY SYSTEMS, INC., Defendant.**

No. CV–92–1769.

United States District Court, E.D. New York.

March 31, 1994.

---

Kenneth A. Bloom, Cozen and O'Connor, New York City, Miles A. Jellinek, Cozen and O'Connor, Philadelphia, PA, for plaintiff.

James V. O'Gara, Cathleen K. Condren, Kelley Drye & Warren, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") brings this diversity action as subrogee to Arkin Medo, Inc. ("Arkin Medo") against ADT Security Systems, Northeast, Inc. ("ADT"), incorrectly sued here as ADT Security Systems, Inc. ADT now moves for summary judgment, or, alternatively, partial summary judgment, pursuant to Fed.R.Civ.P. 56.[1] For the reasons set forth below, the motion for summary judgment is granted.

## FACTS

### A. The Contract

ADT is a corporation engaged in the business of installing, maintaining and monitoring burglar alarm systems. Since September 5, 1978, it has had a contract with Arkin Medo—a company which sells photographic and graphic art supplies—to provide burglar alarm services to Arkin Medo's premises located at 131–27 Fowler Avenue in Flushing, New York (the "premises").

Although ADT and Arkin Medo have entered into several different contracts since 1978, all contracts have contained a provision exculpating ADT from loss due to burglary (the "exculpatory clause"). The exculpatory clause, which is reproduced in boldface capital letters in the contract, provided as follows:

It is understood that [ADT] is not an insurer, that insurance, if any, shall be obtained by [Arkin Medo] and that the amounts payable to [ADT] hereunder are based upon the value of the services and the scope of liability as herein set forth and are unrelated to the value of [Arkin Medo's] property or property of others located in [Arkin Medo's] premises. . . . [Arkin Medo] does not desire this contract to provide for full liability of [ADT] and agrees that [ADT] shall be exempt from liability for loss, damage or injury due

---

1. ADT also has moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Complaint for failure to state a claim upon which relief can be granted. However, because "matters outside the pleading are presented to and not excluded by the court," this motion shall be treated as one for summary judgment and disposed of pursuant to Fed. R.Civ.P. 56.

directly or indirectly to occurrences, or consequences therefrom, which the service or system is designed to detect or avert[.] Affidavit of S. Peter Fogg, Sworn to Dec. 7, 1993 ("Fogg Aff.") Ex. A ¶ E. In addition to the exculpatory clause, the contract in effect on the date of the alleged burglary—which was executed by ADT and Arkin Medo on or about July 28, 1988—contained the following limitation of liability clause (also reproduced in boldface capital letters):

> If ADT should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% of the annual service charge or $10,000, whichever is less, as the agreed upon damages and not as a penalty, as the exclusive remedy[.] [2]

Fogg Aff. Ex. B ¶ E. The contract specified that if Arkin Medo desired ADT to assume greater liability, the contract could be amended "to allow [Arkin Medo] to pay an additional amount necessary for [Arkin Medo] to purchase an insurance policy for such greater liability." Fogg Aff. Ex. B ¶ E. The contract further provided that these terms applied

> If loss, damage or injury irrespective of cause or origin, results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract or from negligence, active or otherwise, of ADT, its agents or employees.

Fogg Aff. Ex. B ¶ E.

### B. *Instructions from Arkin Medo*

Shortly after Arkin Medo's alarm system was installed, a representative of Arkin Medo—who left the employ of the company in 1987—instructed ADT by letter dated December 4, 1978, that the only circumstances in which Arkin Medo was to be called were: (1) should the sprinkler system go off; (2) should there be a fire "with the Fire Department called and responding"; (3) should

there be a "visible forced entry into our premises"; and (4) should the police have to be called. The letter instructed ADT to "[o]therwise, please refrain from calling us." [3] Fogg Aff. Ex. C.

Arkin Medo originally provided ADT with keys to the lobby, warehouse and office area and authorized ADT to enter those areas when investigating an alarm; however, by letter dated September 17, 1982, Arkin Medo requested a "change in [their] Security System procedure." Fogg Aff. ¶ 14 & Ex. E. Pursuant to the new procedures, Arkin Medo directed ADT to "check the entire perimeter of our facility to see if any forced entry has been made." If ADT found the facility secure, it was authorized to unlock the front door and attempt to reset the system, using the controls in the lobby. The letter further directed that ADT personnel "[u]nder no circumstances" were authorized to enter the facility beyond the point of the controls. Fogg Aff. ¶ 14 & Ex. E.

### C. *The Burglary*

At 1:18 a.m. on September 29, 1991, ADT received a burglar alarm signal from the portion of the alarm system connected to the second floor office space of Arkin Medo's premises. Fogg Aff. ¶ 16. ADT immediately dispatched a contract alarm service investigator from a company known as Trans Am to the premises and notified the police. Fogg Aff. ¶ 16 & Ex. F. The investigator reported that he found three zones of the system "tripped," but that there was no sign of forcible entry. Fogg Aff. Ex. F & G. Due to the limited interior access, the investigator was unable to reset the system. Fogg Aff. ¶ 16.

ADT telephoned David Scharf, the President of Arkin Medo, who had been designated as first priority on Arkin Medo's "call list"; Scharf was not home, and a message

---

**2.** It is undisputed that at the time of the burglary, Arkin Medo's annual service charge was $10,850; therefore, pursuant to the limitation of liability clause, ADT's liability would be limited to $10,000.

**3.** Arkin Medo reiterated these instructions through a change request to ADT which indicated that "subs *do not* want to be called unless Actual break sub very irrate." Fogg Aff. Ex. D (emphasis in handwritten original).

was left on his answering machine.[4] ADT then telephoned Daniel Scharf—Arkin Medo's Chief Executive Officer—and advised him that ADT had received an alarm and that the investigator was unable to reset the system. Daniel Scharf responded "No problem. Let it go." Fogg Aff. Ex. H at 16. ADT advised Scharf that it would put in a work order, to which Scharf responded "O.K." Fogg Aff. Ex. H at 15–16.[5] Scharf took no further steps to secure the premises. Daniel Scharf Dep. at 39–40.

Later that same morning, at approximately 3:50 a.m., ADT received another burglar alarm signal from the system located in Arkin Medo's warehouse area and ground floor offices. Fogg Aff. ¶ 18. Again, ADT dispatched the police and an alarm service investigator, Frank Montefusco. Montefusco checked the exterior of the premises and found no sign of a break-in, although he noticed several bullet holes, which he concluded were old, and reported that a bell that normally went off in the lobby did not sound. Fogg Aff. Ex. H at 30–33. He then checked the control unit in the lobby and reported to ADT that two zones were tripped, but that he was unable to clear the system and reset it from the control unit. Montefusco related to the central station supervisor, Efrem Lam, that he had a "gut feeling" that it was a "hit." Fogg Aff. ¶ 18 & Ex. H at 24.[6] Montefusco

testified that he gets these gut feelings "based on absolutely nothing," and that his feelings more often are wrong than right; on this occasion, his feeling was prompted by the fact that there had been signals from the other alarm panel more than two hours earlier. Montefusco Dep. at 38–40. Montefusco recalled that while he telephoned in to ADT from the premises of Arkin Medo, he parked his truck so that if anyone was in the building and attempted to leave, they would see the truck and remain inside. Montefusco Dep. at 49.

Lam testified that he did not feel it was necessary to convey Montefusco's suspicions to Daniel Scharf, because they were not tied to any physical evidence; as Lam stated,

> I can't run an office on gut feelings because it will make us look foolish. What happens if he says it was a gut feeling and I would have called the sub, my man is there and you have a break-in and he goes down and there is nothing wrong. It would make us look foolish. I can't go by gut feelings. You can't do that.

Lam Dep. at 97–98.[7] Lam again telephoned Daniel Scharf and advised him that "the other system went off." Scharf responded that "unless its [sic] a burglary and a . . . forcible, forcible entry, don't call at 3 and 4 in the morning." Fogg Aff. Ex. H at 34–35. How-

---

4. Exhibit H to the Fogg Affidavit is a transcript of the recording and message; pursuant to ADT's standard practice, all telephone conversations between ADT's central station personnel and subscribers concerning alarm signals are recorded. Fogg Aff. ¶ 17.

5. At deposition, Daniel Scharf confirmed his understanding that the inability to reset the system meant that the system was out of operation. Daniel Scharf Dep. at 33–34.

   Efrem Lam, the ADT central station supervisor on duty that evening, testified that to his knowledge, there was no policy in effect requiring subscribers to be notified as to exactly which zones were in trouble; Lam indicated that he "never told the sub any specific zones or anything unless they usually request it." Lam Dep. at 63. Salvatore Balestrieri, a former ADT district service manager, similarly testified that it was not a customary practice at ADT to notify a customer of how many zones had tripped and could not be reset. Balestrieri Dep. at 94–95.

6. When reporting in to ADT, Montefusco also stated "So, at any rate, I don't know what you're going to tell this sucker, but as far as I'm con-

cerned, my gut feeling is, that they came in, some, somehow got in the office...." Fogg Aff.Ex. H at 33.

7. Consistent with Lam's testimony, S. Peter Fogg, the Regional General Manager of ADT, averred that "ADT's central station supervisors and operators are specifically trained and instructed not to engage in speculation with its customers or to make assumptions about the cause of any given alarm condition. Otherwise, customers may accept such speculation as fact and respond accordingly. If the unsubstantiated speculation proves unfounded, ADT's credibility may be undermined." Fogg Aff. ¶ 21.

   In addition, Balestrieri testified that the occurrence of multiple-zone tripping—as was the case here—more often was indicative of a false alarm than an actual break-in, Balestrieri Dep. at 61–62; Louis Kusnitz, the ADT repairman dispatched to investigate the burglary, similarly indicated that multiple zones more frequently were tripped as the result of animal interference or equipment failure, rather than an actual burglary. Kusnitz Dep. at 55–56.

ever, Scharf testified at deposition that if he had been told by ADT that a burglary was occurring, he would have responded. Daniel Scharf Dep. at 38. ADT informed Scharf that both of the alarms were going to be "out," and also advised him that "[f]rom the street, it looks O.K. all around." Scharf's response to the latter statement was "Fine. Terrific." Fogg Aff. Ex. H at 35.[8]

On the morning of September 30, a representative of Arkin Medo notified ADT that the premises had been burglarized. Kusnitz, the ADT repairman, found a small hole cut in the roof of the building. In addition, the wires to the outside bell "PID" (point interface device), located between the roof and the dropped ceiling, had been cut, and several alarm wires had been cut throughout the warehouse. It is undisputed that none of this damage was visible from the exterior of the premises or the lobby area. Fogg Aff. ¶ 20.

Arkin Medo allegedly sustained a loss by theft of property in the amount of $1,196,-648.53. Compl. ¶ 10. Fireman's Fund, who provided property insurance coverage for Arkin Medo, Compl. ¶ 4, subsequently made payment to Arkin Medo in the amount of $1,191,648.53. Compl. ¶ 11. Fireman's Fund, as subrogee to Arkin Medo, thereafter commenced this action by Summons and Complaint filed April 13, 1992, alleging that ADT was grossly negligent.[9] Compl. ¶¶ 8–12.

## DISCUSSION

### I. *Summary Judgment Standards*

Summary judgment is appropriate when the moving party establishes that there exist no genuine issues of material fact that bar the court from granting judgment as a matter of law. Fed.R.Civ.P. 56(c).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted) (emphasis in original). Therefore, summary judgment may be granted if "the evidence is merely colorable, ... or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### II. *The Negligence Claim*

In support of its motion for summary judgment, ADT argues that in the absence of gross negligence, the exculpatory and limitation of liability clauses in its contract with Arkin Medo preclude the claims of Fireman's Fund. Because there is no evidence in the record sufficient to raise a triable issue of fact concerning any gross negligence by ADT, ADT argues, summary judgment is required in its favor.

---

8. In contrast, David Scharf testified that on occasions when he was notified that more than one zone was out and ADT could not reset the system, he went to the premises to make sure they were secure. *E.g.* David Scharf Dep. at 43, 51. He also indicated that he would have been more patient and asked follow-up questions concerning what zones had been affected. David Scharf Dep. at 74. However, he later added that "it was just obvious" that ADT should have conveyed additional information to his father, including the fact that numerous motion detectors, heat sensors and perimeter protection had gone off. David Scharf Dep. at 79–80. The latter testimony is belied, however, by instructions given by Arkin Medo to ADT that if there was no visible forced entry the subscriber was not to be called at all. It is undisputed that there was no visible sign of forced entry from an inspection of the perimeter of the premises or the lobby area—the only area to which Arkin Medo permitted ADT to have access.

9. Plaintiff originally included a fraudulent misrepresentation claim in the Complaint, which ADT moved to dismiss pursuant to Fed.R.Civ.P. 9(b); however, in its papers in opposition to ADT's motion, plaintiff withdrew the misrepresentation claim, conceding that deposition testimony had revealed there was insufficient evidence to support the claim. Affidavit of Miles A. Jellinek, Sworn to Jan. 25, 1994 ("Jellinek Aff.") ¶ 7.

New York courts generally have upheld contractual provisions like the one in the ADT–Arkin Medo contract absolving a party from its own negligence; however, a party may not insulate itself from damages caused by its own grossly negligent conduct. *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554, 593 N.E.2d 1365, 1371, 583 N.Y.S.2d 957, 963 (1992). When invoked to pierce an agreed-upon limitation of liability in a commercial contract, gross negligence must " 'smack[ ] of intentional wrongdoing.... It is conduct that evinces a reckless indifference to the rights of others." Id. (citations omitted) (emphasis added); *see also Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–24, 611 N.E.2d 282, 284, 595 N.Y.S.2d 381, 383 (1993). Accordingly, in order to defeat ADT's motion for summary judgment, Fireman's Fund must raise a genuine issue of material fact concerning whether ADT was grossly negligent.

Fireman's Fund alleges that ADT acted with reckless disregard for the rights of Arkin Medo:

(a) when ADT failed to communicate to Arkin Medo that ADT's experienced alarm service investigator who was physically present at Arkin Medo reasonably believed that a burglary was in progress, (b) when ADT's central station supervisor failed to communicate the urgency of this situation to Arkin Medo and to request that Arkin Medo immediately respond to the premises with keys to the remainder of the interior, (c) when ADT's central station supervisor intentionally concealed relevant information from Arkin Medo and advised Arkin Medo's representative that "from the street it looks okay all around" immediately after having received information from ADT's on-site representative that a burglary had taken place and the perpetrators had gotten into Arkin Medo's office, and (d) when ADT failed to communicate to Arkin Medo the fact that there were multiple zones on multiple floors on multiple ADT systems in alarm on the morning of the burglary.

Jellinek Aff. ¶ 4; *see also* Compl. ¶ 9.

Together with its papers in opposition to the motion for summary judgment, Fire-man's Fund has submitted the Affidavit of Richard A. Lanese, a Certified Protection Professional and Security Consultant. *See* Affidavit of Richard A. Lanese, Sworn to Jan. 11, 1994 ("Lanese Aff."). Lanese opined that ADT's first telephone call to Daniel Scharf was inadequate because "it imparted no detail of importance nor attitude of imminency," and the second call similarly failed to convey the urgency of the situation. Lanese Aff. ¶¶ 6, 17. ADT further erred, he alleged, in failing to ask the subscriber to respond and in failing to ascertain whether the subscriber would respond. Lanese Aff. ¶ 18. In addition, Lanese averred that the presence of twelve zones in alarm at the time of Montefusco's investigation was "an almost certain indication of an actual burglary in progress," because a number of the zones were "highly reliable contacts"; in Lanese's opinion, the alarm could not have been caused by equipment malfunction. Lanese Aff. ¶¶ 8, 14. Contrary to ADT's dismissal of Montefusco's "gut feeling" as "unsubstantiated conjecture," Lanese contended that "[t]welve zones in alarm and two systems out of service is hardly unsubstantiated conjecture." Lanese Aff. ¶ 11. Lanese further opined that the absence of evidence of forcible entry was "inconsequential" given the size, location and access to the building. Lanese Aff. ¶ 8. He concluded that ADT's actions in this matter constituted "a complete and reckless disregard for the rights of Arkin Medo." Lanese Aff. ¶ 19.

After comparing the allegations concerning ADT's alleged failures in this case with allegations asserted in similar cases, it is clear that Fireman's Fund has failed to raise a triable issue concerning ADT's alleged gross negligence. While Fireman's Fund is correct that most of the cases relied upon by ADT involve negligent installation of an alarm system or failure of an alarm company to detect an alarm, rather than an alarm company's "inappropriate response" to an alarm, as plaintiff alleges here, these cases nonetheless provide persuasive authority for concluding that there is no genuine issue of material fact concerning whether ADT's conduct rose to

the level of gross negligence necessary to find liability.

For example, in *Colnaghi*, 81 N.Y.2d 821, 611 N.E.2d 282, 595 N.Y.S.2d 381, plaintiff art gallery sued its alarm services company for negligence after burglars broke into the gallery through an unprotected skylight and stole twenty paintings. The Supreme Court denied the defendant's motion for summary judgment, a decision which the Appellate Division affirmed, finding that the affidavit submitted by plaintiff's expert—which described defendant's failure to protect the skylight as a "major vulnerability"—created a triable issue of fact on gross negligence. The Court of Appeals reversed, holding that "[t]he failure to wire a skylight, while perhaps suggestive of negligence or even 'gross negligence' as used elsewhere, does not evince the recklessness necessary to abrogate Colnaghi's agreement to absolve Jeweler's from negligence claims." *Id.* at 824, 611 N.E.2d at 284, 595 N.Y.S.2d at 383. *See also David Gutter Furs v. Jewelers Protection Servs., Ltd.,* 79 N.Y.2d 1027, 1029, 594 N.E.2d 924, 924–25, 584 N.Y.S.2d 430, 430 (1992) (expert's opinion that alarm company should have installed two motion detectors, instead of one, on each level, as well as a shock sensor, and should have ascertained how inventory would be arranged and performed a post-occupancy inspection did not raise an issue of fact concerning whether defendant performed its duties with reckless indifference to plaintiff's rights); *Stuart Rudnick, Inc. v. Jewelers Protection Servs., Ltd.,* 194 A.D.2d 317, 598 N.Y.S.2d 235, 236 (1st Dep't 1993) (reversing supreme court's denial of defendant's motion for summary judgment where failure to maintain a video camera overseeing safety deposit boxes "while clearly negligent, and even grossly negligent as used in other contexts," did not satisfy gross negligence standard); *Nathan Silberberg Galleries, Ltd. v. Holmes Protection of N.Y., Inc.,* Index No. 5848/92 (N.Y.Sup.Ct. July 28, 1993) (no issue of fact concerning whether alarm company was grossly negligent where company notified police of alarm and sent guard to investigate premises, but guard determined "there was nothing amiss" without gaining access to rear storage room), *aff'd,* — A.D.2d —, 609 N.Y.S.2d 777 (1st Dep't 1994).

The three cases heavily relied upon by Fireman's Fund do not compel a different result. In *Sommer,* 79 N.Y.2d 540, 593 N.E.2d 1365, 583 N.Y.S.2d 957, the plaintiff asked the defendant alarm company to deactivate its alarm system on a Saturday because of work being done at the building. Pursuant to its usual practice, defendant reactivated the system Saturday night. The following Monday, plaintiff's chief engineer—who was unaware that service had been restored—asked defendant to reactivate the system. Defendant's allegedly untrained, inexperienced dispatcher became confused, and "concluded—without attempting to elicit greater clarification from the caller, or any other confirmation"—that the engineer wanted the system taken out of service. *Id.* at 548–49, 593 N.E.2d at 1367, 583 N.Y.S.2d at 589. A four-alarm fire broke out shortly thereafter, but "consistent with his mistaken impression that the system was to be taken out of service, the dispatcher simply assumed that he should ignore the signals." *Id.* The New York Court of Appeals found a triable issue existed as to whether this was "a case of a simple mistake or reckless indifference." *Id.* at 555, 593 N.E.2d at 1371, 583 N.Y.S.2d at 963–64.

Similarly, the facts in *Hanover Ins. Co. v. D & W Central Station Alarm Co., Inc.,* 164 A.D.2d 112, 560 N.Y.S.2d 293 (1st Dep't 1990), also relied upon by plaintiff, are inapposite. In that case, defendant received two alarm signals from the subject premises, but did not dispatch a guard until almost an hour and a half after the second alarm, and did not notify the police until almost five hours thereafter. The guard left the subject premises without investigating the alarm condition because he could not gain entry into the building, and "when he called D & W to so inform them, he was told to 'forget that assignment and go on another guard run.'" *Id.* at 113–14, 560 N.Y.S.2d at 294. The court held that D & W's failure to notify the police and its decision to direct the guard to "forget" the assignment generated triable issues of fact concerning whether D & W was grossly negligent. *Id.* at 115, 560 N.Y.S.2d at 295–96.

Finally, in *Rand & Paseka Mfg. Co., Inc. v. Holmes Protection Inc.*, 130 A.D.2d 429, 515 N.Y.S.2d 468 (1st Dep't 1987), *appeal denied*, 70 N.Y.2d 615, 519 N.E.2d 623, 524 N.Y.S.2d 677 (1988), defendant alarm services company had a contract with plaintiff pursuant to which any unauthorized entry created an "alarm condition" requiring defendant to respond within fifteen minutes. Plaintiff's premises were broken into on a Saturday afternoon; eleven hours after the break-in, defendant sent two guards to investigate. While defendant claimed it had received an "opening code"—permitting an authorized person to enter the premises on an unauthorized day—it failed to produce the only person who could substantiate that claim. *Id.* at 430, 515 N.Y.S.2d at 469. In addition, another break-in had occurred several weeks earlier, which plaintiff claimed it was not told about until four weeks after the fact; and defendant admitted it did not have the relevant instruction cards indicating which days plaintiff was open. Concluding that a jury could have found that defendant's actions constituted gross negligence, the court reversed the order of the supreme court setting aside the jury verdict for plaintiff. *Id.* at 430–31, 515 N.Y.S.2d at 470.

Addressing each of plaintiff's allegations in turn, it is clear that the actions or inactions of ADT claimed by Fireman's Fund to be grossly negligent in this case do not rise to the level of those discussed in the foregoing cases. First, plaintiff claims that a trier of fact might infer that ADT acted with reckless disregard when it failed to inform Arkin Medo that its investigator "reasonably believed that a burglary was in progress," and when it advised Arkin Medo that " 'from the street it looks okay all around' immediately after having received information from ADT's on-site representative that a burglary had taken place and the perpetrators had gotten into Arkin Medo's office." Jellinek Aff. ¶ 4. As a preliminary matter, the characterization of Montefusco's "gut feeling" as "information ... that a burglary had taken place and the perpetrators had gotten in to Arkin Medo's office" is a flagrant mischaracterization of a "gut feeling." Moreover, Fogg and Lam both have averred that ADT's central station supervisors are instructed not to engage in speculation, which—as Montefusco has conceded—is all his "gut feeling" amounted to. Particularly in light of Arkin Medo's strict directives to ADT to limit the circumstances in which its principals were called, ADT's decision to refrain from speculation does not "smack of intentional wrongdoing," as is required to generate a question of gross negligence.[10]

Plaintiff also alleges that ADT was grossly negligent in failing: (1) to communicate the urgency of the situation to Arkin Medo; (2) to advise Arkin Medo that multiple zones on multiple floors were in alarm; and (3) to request that Arkin Medo come to the premises. Jellinek Aff. ¶ 4. However, it is undisputed that ADT twice telephoned Daniel Scharf; that Daniel Scharf was aware that the alarm system was out of operation, but elected not to come to the premises; that Daniel Scharf told ADT that "unless its [sic] a burglary and a ... forcible, forcible entry, don't call at 3 and 4 in the morning," Fogg Aff.Ex. H at 34–35; and that David Scharf testified that he would have come to the premises—and many times had gone to the premises—if called under similar circumstances. When considered in conjunction with the testimony of Lam and Balestrieri that there was no policy in effect requiring subscribers to be told exactly what zones were in trouble, and the testimony of Balestrieri and Kusnitz that the tripping of multiple zones is more indicative of a false alarm than a burglary, this evidence drives me to conclude that there is no question concerning whether ADT was grossly negligent.[11]

10. While the relevance of Arkin Medo's instructions to ADT is disputed due to Lam's testimony that he did not remember if he had referred to the instructions on the morning of the break-in, Lam Dep. at 21 & Pl.'s 3(g) Statement ¶ 7, notwithstanding the instructions, the record is clear that ADT was acting in accordance with its standard procedures.

11. The opinion of plaintiff's expert Mr. Lanese that "[t]he likelihood of multiple zone false alarms in this type of situation is almost nonexistent," Lanese Aff. ¶ 8, is not dispositive and indeed raises no issue of fact concerning reckless indifference. *See Colnaghi*, 81 N.Y.2d at 823–24, 611 N.E.2d at 283–84, 595 N.Y.S.2d at 382–83 (finding that expert's affidavit stating, *inter alia*,

In short, the central, undisputed facts of this case—that in response to each of two alarm signals, ADT dispatched the police and an alarm service investigator; that the investigators conducted an exterior search of the premises and a limited interior search consistent with the directions from Arkin Medo; that there were no signs of forcible entry; and that ADT twice notified Daniel Scharf that an alarm had been received and the system could not be reset—show that there is no genuine issue regarding any gross negligence by ADT in responding to the alarms at Arkin Medo. It bears noting that this result is supported by sound public policy. The Second Circuit recently has recognized that while the supplier of an alarm system is paid for its equipment and services, this price generally does not "include a sum designed to anticipate the possible need to pay the purchaser the value of the property that the system is designed to protect." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 49 (2d Cir.1993). Moreover, the owner of the property is in a better position to know the property's value and to bargain with an insurance company for appropriate coverage.[12] *Id.* As the New York Court of Appeals has noted, these "limitations on liability help keep alarm services affordable." *Sommer*, 79 N.Y.2d at 554, 593 N.E.2d at 1370, 583 N.Y.S.2d at 962; *see also Eaves Brooks Costume Co., Inc. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 227, 556 N.E.2d 1093, 1096–97, 557 N.Y.S.2d 286, 289–90 (1990) (alarm company's liability should be contained within limits envisioned by contract to keep services at an affordable rate).

In light of the conclusion reached above that Fireman's Fund has failed to proffer a triable issue concerning whether ADT was grossly negligent, it is unnecessary to address ADT's alternative argument that the claim of Fireman's Fund is barred by its express assumption of the risk.[13]

### CONCLUSION

In sum, Fireman's Fund has done little more than raise some "metaphysical doubt" based entirely upon Montefusco's "gut feeling" as to the material facts. Taking the record as a whole, a rational fact-finder could not decide in favor of the non-moving party and there is, therefore, no genuine issue of material fact which would deter granting summary judgment to ADT, the moving party.

SO ORDERED.

---

that alarm company's actions fell " 'far below professional standards and customary practice in the industry' " failed to raise question of gross negligence).

12. Arkin Medo did precisely that—bargained with and paid Fireman's Fund for appropriate coverage understanding that ADT was not an insurer. *See* p. 292, *supra*. It is interesting to note that upon oral argument Fireman's Fund stated that it knew of no contractual obligation its policy imposed upon Arkin Medo to install a burglar alarm. Had Arkin Medo not done so, Fireman's Fund would have paid for the loss it was paid to insure against shorn of the ability to attempt to shift that loss to another. By installing a burglar alarm, Arkin Medo conferred upon its insurer, Fireman's Fund, the fortuitous and beneficial status of subrogee with the attendant ability to attempt to shift its loss to ADT who specifically disclaimed that it was an insurer.

13. Plaintiff's argument that it has been denied discovery concerning Trans Am investigator Wil-

liam Ross and former ADT Central Station Operator Shirley Taylor, and that summary judgment therefore is inappropriate pursuant to Fed. R.Civ.P. 56(f), also is without merit. A party seeking additional discovery pursuant to Rule 56(f) must file an affidavit explaining "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) (*citing Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985)). Although the Jellinek Affidavit complies with the third and fourth requirements, Jellinek Aff. ¶ 8, it fails to explain how any discovery obtained from these individuals would create an issue of material fact. Summary judgment therefore is appropriate for all the reasons stated above.