AMERICAN AUTOMOBILE INSURANCE COMPANY, as subrogee of TNP Corporation d/b/a Brass Anchor Restaurant, Plaintiff,

v.

REST ASSURED ALARM SYSTEM, INC., Respondent.

Case No. 08–CV–11013 (KMK).

United States District Court, S.D. New York.

March 31, 2011.

Mark E. Opalisky, Esq., Robert W. Phelan, Esq., Cozen O'Connor, Philadelphia, PA, New York, NY, for Plaintiff.

Daniel Thomas Gluck, Esq., Zaremba Brownell & Brown, PLLC, New York, NY, for Defendant.

KENNETH M. KARAS, District Judge:

Plaintiff American Automobile Insurance Co. ("AAIC"), a Missouri corporation, brought this diversity action against De-

fendant Rest Assured Alarm System, Inc. ("Rest Assured"), a New York corporation, to recover insurance payments AAIC made to its insured, the Brass Anchor Restaurant ("Brass Anchor") in Poughkeepsie, New York, following a fire at the insured's premises. (Compl. ¶¶ 1–2, 5, 10.) AAIC's complaint alleges negligence and breach of contract claims against Rest Assured, which allegedly agreed to install, inspect, and monitor the fire alarm system at Brass Anchor. Now pending is Rest Assured's motion to dismiss the Complaint pursuant to Rule 12(b)(6) based on the exculpatory clauses contained in the contract between Rest Assured and Brass Anchor. (Dkt. No. 23.) The motion is granted.

## I. Background

The Complaint alleges the following facts, which the Court accepts as true: Brass Anchor was a restaurant located in Poughkeepsie, New York. (Compl. ¶ 5.) At an unspecified time prior to December 1, 2005, Rest Assured agreed to sell Brass Anchor a fire alarm system and installed it. (Id. ¶¶ 6–7.) By a contract titled "Digital Lease Agreement" dated December 1, 2005 (the "DLA"), Rest Assured leased to Brass Anchor a "central station transmitter" device. (Def.'s Mot. Exh. B ("DLA") (Dkt. No. 23) ¶ 1; Compl. ¶ 8.) The purpose of this device was to send a signal to Rest Assured or its designee in the event the alarm system was triggered; Rest Assured agreed in the DLA to "make every reasonable effort" to notify the police and fire department upon receiving such a signal. (DLA ¶ 5.) Rest Assured allegedly made inspections and repairs to the alarm system between December 1, 2005 and December 23, 2006. (Compl. ¶ 9.)

On December 23, 2006, a fire broke out at Brass Anchor. (Id. ¶ 10.) The alarm system failed to detect the fire in its early stages due to alleged "defects." (Id. ¶ 12.) "Just weeks prior" to the fire, Rest Assured had repaired the alarm system and installed new parts, and indicated to Brass Anchor that the system was working. (Id. ¶ 11.) The fire caused significant damage to Brass Anchor, and AAIC paid over $1,500,000 pursuant to Brass Anchor's insurance policy to cover its losses. (Id. ¶¶ 13–15.)

AAIC brought the present action in December 2008 as subrogee to the rights of Brass Anchor. The Complaint asserts claims for negligence and breach of contract. AAIC alleges that the fire spread due to the negligence and "gross negligence" of Rest Assured in its failure to properly install, test, monitor and repair the alarm system, and failure to hire competent employees to do so. (Id. ¶ 19.) The Complaint also alleges that Rest Assured breached "several written and/or oral contracts and/or agreements" it made with Brass Anchor pursuant to which Rest Assured was obligated to properly inspect, monitor, and repair the alarm system. (Id. ¶ 23.)

Three out of the fifteen paragraphs of the DLA are prominently given over to limiting Rest Assured's liability in the event of damage to Brass Anchor:

11. NO WARRANTIES OR REPRESENTATIONS: LESSEE'S [BRASS ANCHOR'S] EXCLUSIVE REMEDY: Lessor [Rest Assured] does not represent or warrant that the Alarm System and Central Station Monitoring will prevent any loss, damage or injury to person or property, by reason of burglary, theft, holdup, fire or otherwise, or that the Alarm System will in all cases provide protection of which it is installed or intended. [Brass Anchor] acknowledges that [Rest Assured] is not an insurer, and that [Brass Anchor] assumes all risk for loss or damage to [Brass Anchor's]

premises or its' [*sic*] contents. [Rest Assured] has made no representation or warranties, and hereby disclaims any warrant of merchantability of fitness for any particular use. [Brass Anchor's] exclusive remedy for [Rest Assured's] default hereunder is to require [Rest Assured] to repair or replace, at [Rest Assured's] option, any equipment or part of the Alarm System, which is non-operational.

12. EXCULPATORY CLAUSE: The parties agree that [Rest Assured] is not an insurer and no insurance coverage is offered herein. [Brass Anchor's] payments to [Rest Assured] are for the installation, rental, maintenance and monitoring of an Alarm System designed to reduce certain risks of loss, though [Rest Assured] does not guarantee that no loss will occur. [Rest Assured] is not assuming responsibility and therefore shall not be liable to [Brass Anchor] as a result of burglary, theft, holdup, fire, equipment failure, or any other cause whatsoever, regardless of whether or not such loss or damage was caused by or contributed to by [Rest Assured's] negligent performance or failure to perform any obligation under the Agreement.

13. LIMITATION OF LIABILITY: The parties agree that the Alarm System is not designed or guaranteed to prevent loss by burglary, theft and other illegal acts of third parties, or loss by fire. If not withstanding the terms of the Agreement, there should arise any liability on the part of [Rest Assured], such liability shall be limited to an amount equal to six times the monthly payment paid by [Brass Anchor] at the time such liability is fixed, or the sum of $100.00, whichever is greater. If [Brass Anchor] wishes to increase [Rest Assured's] maximum amount of such limitation of liability, [Brass Anchor] may,

as a matter of right, at any time, by entering into a supplemental agreement, obtain from [Rest Assured] a higher limit by paying an additional amount consistent with the increase of liability.

(DLA ¶¶ 11–13.)

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir.2010) ("We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.").

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration, citations, and internal quotation marks omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from

conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

 Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted). "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester Cnty. Health Care Corp.,* 232 F.Supp.2d 273, 275 (S.D.N.Y.2002). Additionally, even if not attached or incorporated by reference, a document upon which the complaint "solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (internal quotation marks and emphasis omitted). Here, the Complaint refers to the DLA (Compl. ¶ 8), and alleges that Rest Assured breached its "agree-

ments" and "contractual obligations" with Brass Anchor, (*id.* ¶¶ 23–24). The Court therefore deems the DLA incorporated by reference into the Complaint. *See Verzani v. Costco Wholesale Corp.,* 641 F.Supp.2d 291, 297–98 (S.D.N.Y.2009) ("[W]here the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim.").

## B. AAIC's Claims for Negligence and Breach of Contract

Rest Assured argues that the DLA's exculpatory clause, paragraph 12, bars any liability resulting from the fire at Brass Anchor, and, even if liability were to be found, paragraph 13 limits Rest Assured's exposure to the greater of $100 or six times Brass Anchor's monthly payment. (Def.'s Mot. 11–13.)

 Whether the exculpatory clause bars AAIC's claims is a matter of contract interpretation. "Because contract interpretation is generally a question of law, it is suitable for disposition on a motion to dismiss." *Medtech Prods. Inc. v. Ranir, LLC,* 596 F.Supp.2d 778, 807 (S.D.N.Y. 2008) (internal quotation marks omitted). "Whether the contract is unambiguous is a question of law for the court." *Continental Ins. Co. v. Atl. Cas. Ins. Co.,* 603 F.3d 169, 180 (2d Cir.2010) (internal quotation marks omitted). "If the contract is unambiguous, its meaning is likewise a question of law for the court to decide." *Napster, LLC v. Rounder Records Corp.,* 761 F.Supp.2d 200, 206 (S.D.N.Y.2011) (internal quotation marks omitted). Under New York law, which governs here,[1] a contract

---

1. The Parties have not explicitly addressed what law governs the DLA. The Parties have briefed this case on the apparent assumption that New York law applies. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss (Dkt. No. 25) 8; Def.'s Mot. 8.) This is sufficient for

the Court to apply New York law in this case. *See Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir.2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." (internal quotation

is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir.2010) (internal quotation marks omitted). "If the contract is unambiguous, that is, only susceptible to one reasonable interpretation, the court must give effect to the contract as written." *Madeleine L.L.C. v. Street*, 757 F.Supp.2d 403, 405 (S.D.N.Y.2010) (internal quotation marks omitted).

█ The exculpatory clause, paragraph 12 of the DLA, is unambiguous: the parties to the DLA agreed that Rest Assured could not be held liable for breach of contract or for any loss resulting from failure of the alarm system or a fire. "[Rest Assured] is not assuming responsibility and therefore *shall not be liable* to [Brass Anchor] as a result of . . . fire, equipment failure, *or any other cause whatsoever, regardless of whether or not* such loss or damage was caused by or contributed to by [Rest Assured's] negligent performance or failure to perform any obligation under the Agreement." (DLA ¶ 12 (emphasis added).) The clause encompasses any losses resulting from fire or failure of the alarm system (the only damages AAIC could possibly seek as Brass Anchor's subrogee), no matter how Rest Assured's acts or omissions or its failure to perform a contractual obligation might have contributed to them.

"New York courts have repeatedly and consistently enforced exculpatory clauses in contracts for the installation, leasing, and servicing of alarm systems," *Sue & Sam Mfg. Co. v. United Protective Alarm Sys., Inc.*, 119 A.D.2d 664, 501 N.Y.S.2d 102, 102 (1986), and courts have dismissed claims both for breach of contract and negligence arising from losses resulting when the harm the alarm system is meant to prevent occurs. *See id.* at 102–03 (awarding summary judgment in favor of alarm company on breach of contract claim arising from burglary); *Advance Burglar Alarm Sys., Inc. v. D'Auria*, 110 A.D.2d 860, 488 N.Y.S.2d 416, 417 (1985) (same); *see also Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1370 (1992) (holding that "a contractual provision absolving a party from its own negligence will be enforced" in a fire alarm case); *Florence v. Merchants Cent. Alarm Co.*, 51 N.Y.2d 793, 433 N.Y.S.2d 91, 412 N.E.2d 1317, 1318 (1980) (noting that installer of police alarm system could contractually limit its liability so long as limitation was not obscured from plaintiffs' notice). AAIC was not a party to the DLA, but that does not matter and AAIC does not claim otherwise. The DLA binds Brass Anchor, and in a subrogation action AAIC "stands in the shoes" of Brass Anchor and is entitled to only those remedies Brass Anchor could invoke. *U.S. Fid. & Guar. Co. v. E.W. Smith Co.*, 46 N.Y.2d 498, 414 N.Y.S.2d 672, 387 N.E.2d 604, 606 (1979); *see also Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.*, 387 F.Supp.2d 299, 305 (S.D.N.Y.2005) ("As subrogee, [the insurer] has only the same claims that [the insured] could make.").

█ This result also comports with the evident intent of Brass Anchor and Rest Assured. "As a general matter, the objective of contract interpretation is to give

marks and alteration omitted)); *Prince of Peace Enters. v. Top Quality Food Mkt., LLC*, 760 F.Supp.2d 384, 397 (S.D.N.Y.2011)

("[T]he parties have consented to application of New York law by briefing all issues under the law of [N]ew York.").

effect to the *expressed* intentions of the parties; the best evidence of what parties to a written agreement intend is what they say in their writing." *Law Debenture Trust Co.,* 595 F.3d at 467 (emphasis in original) (internal quotation marks, citations, and alteration omitted). The DLA states twice that Rest Assured "is not an insurer," (DLA ¶¶ 11, 12), and provides that Brass Anchor would bear "all risk for loss or damage to [Brass Anchor's] premises or its' [*sic*] contents," (*id.* ¶ 11). Failure to apply the exculpatory clause here would gut this provision. New York courts enforce liability limitations in alarm system contracts precisely because such clauses allow alarm companies to offer their services at an affordable cost. *See Sommer,* 583 N.Y.S.2d 957, 593 N.E.2d at 1370; *cf. Leon's Bakery, Inc. v. Grinnell Corp.,* 990 F.2d 44, 49 (2d Cir.1993) (holding exculpatory clause enforceable under Connecticut law, noting that "the price [of the fire alarm] does not generally include a sum designed to anticipate the possible need to pay the purchaser the value of the property that the system is to protect[;][t]he owner ... of the property is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium"). Absent such provisions, fire alarm companies could in effect be turned into insurers (or reinsurers of the insurance industry) and be on the hook for all damages resulting when their systems fail to work. Part (and maybe a *big* part) of the bargain between Rest Assured and Brass Anchor presumably was the type of exchange referred to in *Sommer* and *Leon's Bakery*—lower costs in exchange for limited liability—and the Court's .failure to enforce the exculpatory clause at this point would deprive the parties of the benefit of this bargain. (*See* DLA ¶ 13 (limiting Rest Assured's liability, should any be found, but allowing Brass Anchor to increase Rest Assured's exposure by "paying an additional amount").)

AAIC responds that the DLA does not bar its claims because the DLA by its terms governs only the installation and monitoring of the central station transmitter, and does not apply to claims relating to Rest Assured's other obligations: to install, test, maintain, and repair the alarm system itself. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss (Dkt. No. 25) 4.) AAIC contends that its negligence and breach of contract claims are about Rest Assured's conduct performing these tasks and do not arise from any malfunction of the transmitter specifically, so the exculpatory clause in the DLA does not apply. *See OneBeacon Am. Ins. Co. v. Comsec Ventures Int'l, Inc.,* No. 07–CV–900, 2010 WL 114819, at *4 (N.D.N.Y. Jan. 7, 2010) (holding that exculpatory clause in a "Security Fire Monitoring Agreement" did not bar claims for negligent installation or maintenance of the alarm system because agreement's subject matter was limited to monitoring and the exculpatory clause "[did] not indicate that it was intended to extend to claims arising out of maintenance and upgrade work performed prior to" agreement's execution); *Metro. Prop. & Cas. Ins. Co. v. Budd Morgan Cent. Station Alarm Co.,* 95 F.Supp.2d 118, 123 (E.D.N.Y.2000) (recognizing distinction between claims arising under alarm monitoring contract and claims "arising from activities ... that fall outside of the [c]ontract's provisions").

The DLA cannot be read so narrowly. The paragraphs limiting Rest Assured's liability expressly encompass the alarm system as a whole, not just the central station transmitter. Paragraph 12 says that Rest Assured is absolved from liability for loss or damage resulting from "any ... cause whatsoever." It expressly contemplates that such causes could include things other than Rest Assured's

negligent (or lack of) performance of its obligations *under the DLA:* liability is barred for "any cause ... *regardless of whether*" it arose due to negligent performance or default on the DLA, or, presumably, from some other source. (DLA ¶ 12.) Paragraph 13 similarly limits Brass Anchor's recovery in case *"any* liability" on the part of Rest Assured should arise. (*Id.* ¶ 13.) The DLA also contains a disclaimer of warranty applying to *both* the "Alarm System and Central Station Monitoring." (*Id.* ¶ 11.) Further, the DLA as a whole, though assuredly focused on the provision of central monitoring for the alarm system, does create obligations on the parties that are not so limited: for instance, the parties agreed that Brass Anchor would not allow anyone other than Rest Assured to make repairs "to the System." (DLA ¶ 14.) Even assuming that one of the DLA's purposes was the provision of monitoring services,[2] that cannot

alter the unambiguous language of the agreement. *See Rodolitz v. Neptune Paper Prods., Inc.,* 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628, 630–31 (1968) ("[T]he rule is well settled that a court may not, under the guise of interpretation, make a new contract for the parties or change the words of a written contract so as to make it express the real intention of the parties if to do so would contradict the clearly expressed language of the contract.... [W]e concern ourselves with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote." (internal quotation marks omitted)).[3]

The breach of contract and negligence claims must therefore be dismissed pursuant to the exculpatory clause.

## C. AAIC's Claim for Gross Negligence

AAIC further contends that even if the DLA applies, AAIC has stated a claim for

---

**2.** AAIC relies heavily on the deposition of Robert D. Nelson, an employee of Rest Assured, who apparently testified that the DLA "did not cover maintenance of the alarm system" and "was limited solely to the installation and lease of the digital dialing device that was within the alarm control panel." (Pl.'s Mem. 4.) Rest Assured notes that Mr. Nelson had "absolutely no responsibility, duties, or experience whatsoever in negotiating or executing contracts." (Def.'s Reply Mem. of Law in Resp. to Pl.'s Opp'n & in Further Supp. of the Mot. to Dismiss Pursuant to FRCP 12(b)(6) ("Def.'s Reply") (Dkt. No. 24.) 3–4.) The Court may not consider this testimony for two reasons. First, no party has actually sought to enter Mr. Nelson's testimony into the record. *See* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings *are presented to* and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." (emphasis added)). Second, even if the description of snippets of Mr. Nelson's testimony in AAIC's brief suffices to "present" it to the Court, the testimony is irrelevant:

It is well established that a court may not admit extrinsic evidence in order to deter-

mine the meaning of an unambiguous contract. As to such a contract, a party is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing, or in order to increase a party's obligations where those obligations were explicitly outlined in the contract itself.

*Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002) (alteration, citations, and internal quotation marks omitted).

**3.** To be sure, the Court would be reluctant to adopt a reading of the liability limitations that *would frustrate* the overall purpose of the contract. *See Postlewaite v. McGraw–Hill, Inc.,* 411 F.3d 63, 67 (2d Cir.2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract."); *Empire Props. Corp. v. Mfrs. Trust Co.,* 288 N.Y. 242, 43 N.E.2d 25, 28 (1942) (same). But there is nothing inconsistent between an agreement to provide Brass Anchor with monitoring services and an agreement to limit Rest Assured's liability should its alarm system fail to work.

gross negligence.[4] The Court disagrees.

██ "[A] contractual provision absolving a party from its own negligence will be enforced," but New York public policy prevents a party from "insulat[ing] itself from damages caused by *grossly* negligent conduct." *Sommer*, 583 N.Y.S.2d 957, 593 N.E.2d at 1370 (emphasis added); *see also Indus. Risk Insurers*, 387 F.Supp.2d at 305 ("[R]eleases of claims for gross negligence are unenforceable, though the party seeking to enforce the agreement will have to meet a particularly high standard of gross negligence."); *Hanover Ins. Co. v. D & W Cent. Station Alarm Co.*, 164 A.D.2d 112, 560 N.Y.S.2d 293, 295 (1990) ("[E]xculpatory clauses in security alarm contracts have been repeatedly enforced by the courts of this State, and claims for breach of these contracts have been dismissed, where the plaintiff has sought to recover damages for losses sustained as a result of crimes such as burglaries. However, to the extent that such agreements purport to grant exemption for liability for willful or grossly negligent acts, they have been viewed as wholly void." (alterations, citations, and internal quotation marks omitted)); *World Trade Knitting Mills, Inc. v. Lido Knitting Mills, Inc.*, 154 A.D.2d 99, 551 N.Y.S.2d 930, 937 (1990) (holding that exculpatory clause in fire alarm contract was enforceable "in the absence of any evidence of gross negligence on the part of the [alarm company]").

██ In the context of contractual limitations on liability, "[g]ross negligence [in New York] is defined as conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing. To constitute gross negligence, the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.*, 204 F.Supp.2d 639, 644 (S.D.N.Y.2002) (internal quotation marks and citations omitted); *see also Fireman's Fund Ins. Co. v. ADT Sec. Sys., Inc.*, 847 F.Supp. 291, 296 (E.D.N.Y.1994) ("When invoked to pierce an agreed-upon limitation of liability in a commercial contract, gross negligence must smack of intentional wrongdoing." (internal quotation marks and emphasis omitted)). "Ordinary mistakes or miscalculations in performing a task will not meet this standard." *Indus. Risk Insurers*, 387 F.Supp.2d at 307. A plaintiff may not overcome a contractual limitation on liability "simply because [he] has added a conclusory allegation of gross negligence to a cause of action." *Id.; cf. Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

██ In the alarm system context, a plaintiff generally does not state a cause of action for gross negligence when the claim is merely one of "inappropriate installation" or inspection of an alarm system or an "inappropriate response to an alarm." *Budd Morgan*, 95 F.Supp.2d at 122. *See, e.g., Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.S.2d 821, 595 N.Y.S.2d 381, 611 N.E.2d 282, 284 (1993) (burglar alarm company's failure to wire a

---

**4.** Rest Assured contends that a tort claim, whether for ordinary or gross negligence, may not be maintained where the defendant owes no duty to the plaintiff distinct from the defendant's contractual obligations. (Def.'s Mot. 18.) Rest Assured is incorrect in the context of fire alarm cases, as the New York Court of Appeals held in *Sommer* that a plaintiff who alleges that a defendant fire alarm company performed its contractual obligations negligently and, therefore, that the company is liable on both a contract and tort theory for damages resulting from a fire, may proceed on a tort claim as well as a breach of contract claim due to the nature of a fire alarm company's duties, which are owed to the public as well as to its customers. *See Sommer*, 583 N.Y.S.2d 957, 593 N.E.2d at 1368–70.

skylight, "while perhaps suggestive of negligence or even 'gross negligence' as used elsewhere, does not evince the recklessness necessary to abrogate [an] agreement to absolve [the alarm company] from negligence claims"); *David Gutter Furs v. Jewelers Prot. Servs., Ltd.,* 79 N.Y.2d 1027, 584 N.Y.S.2d 430, 594 N.E.2d 924, 924 (1992) (allegations that alarm system was improperly designed and that alarm company failed to conduct post-installation inspection did not constitute gross negligence); *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.,* 77 A.D.3d 431, 908 N.Y.S.2d 654, 656 (2010) (allegations that alarm company had a "delayed or inadequate response to an alarm signal" and "provided an inadequate security system, which [it] also failed to inspect, amount to nothing more than claims of ordinary negligence as opposed to gross negligence"); *World Trade Knitting Mills,* 551 N.Y.S.2d at 936 (allegations that alarm failed to activate and that alarm company failed to inspect alarm system did not constitute gross negligence); *Sue & Sam Mfg.,* 501 N.Y.S.2d at 102–03 (allegation that alarm company failed to install two motion detectors did not raise issue of fact regarding company's gross negligence) *cf. Sommer,* 583 N.Y.S.2d 957, 593 N.E.2d at 1367, 1371 (summary judgment inappropriate on gross negligence claim where alarm company dispatcher mistakenly thought premises' owner asked for its alarm system to be deactivated); *Hanover,* 560 N.Y.S.2d at 295–96 (question of fact existed on gross negligence claim where alarm company failed to notify police of receipt of multiple alarm signals over several hours and told security guard to "forget" the assignment because he could not enter the building); *Rand & Paseka Mfg. Co. v. Holmes Prot. Inc.,* 130 A.D.2d 429, 515 N.Y.S.2d 468, 469 (1987) (jury could have found gross negligence where, among other things, alarm company sent guards to premises eleven hours after the burglary, which took several hours, began).

Here, the Complaint alleges no more than Rest Assured's failure to properly install, monitor, test, and repair the alarm system, coupled with a conclusory statement that Rest Assured was "reckless[ ] and/or gross[ly] negligen[t]." (Compl. ¶ 20.) Such allegations are insufficient to state a cause of action for gross negligence. Not a single fact suggesting *why* Rest Assured is believed to have been grossly negligent—i.e., any conduct that "smacks of intentional wrongdoing"—is alleged. *See Indus. Risk Insurers,* 387 F.Supp.2d at 307 (stating, in ruling on a Rule 12(b)(6) motion, that "New York courts are unwilling to let cases with releases of liability go to a jury on the issue of gross negligence simply because the plaintiff has added a conclusory allegation of gross negligence to a cause of action"); *Abacus,* 908 N.Y.S.2d at 656 (reversing denial of motion to dismiss where plaintiff's allegations "amount[ed] to nothing more than claims of ordinary negligence"); *cf. Sue & Sam Mfg.,* 501 N.Y.S.2d at 103 ("The plaintiff cannot rely on conclusory assertions of gross negligence ... to defeat a motion for summary judgment.")

## III. Conclusion

To summarize, the provisions of the DLA limiting Rest Assured's liability bar AAIC's claims for breach of contract and negligence. The Court may not "re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery." *DynCorp v. GTE Corp.,* 215 F.Supp.2d 308, 318 (S.D.N.Y.2002). AAIC has failed to plausibly allege gross negligence on Rest Assured's part. Rest Assured's motion to dismiss is therefore granted in its entirety, with prejudice with respect to AAIC's contract and negligence claims and

without prejudice with respect to AAIC's gross negligence claim. The Clerk is respectfully requested to terminate the relevant motion (Dkt. No. 23). Plaintiff has thirty days to file an Amended Complaint consistent with this Opinion.

SO ORDERED.