**INDUSTRIAL RISK INSURERS,**

v.

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
et al., Defendants.**

**No. 02 Civ. 7170(AKH).**

United States District Court,
S.D. New York.

Jan. 26, 2005.

300

Douglas J. Pepe, Gregory P. Joseph, Gregory P. Joseph Law Offices LLC, Peter Neil Wang, Friedman, Wang & Bleiberg, P.C., New York City, Robert A. Clifford, Timothy Tomasik, Clifford Law Offices, P.C., Chicago, IL, for Plaintiff.

Beth D. Jacob, Schiff Hardin & White, John L. Castelly, Schiff Hardin LLP, New York City, for Defendants.

### OPINION AND ORDER DISMISSING COMPLAINT AGAINST CITIGROUP DEFENDANTS

HELLERSTEIN, District Judge.

The raging, unquenchable fires of September 11, 2001, brought down, not only the Twin Towers of the World Trade Center, buildings One and Two, but building Seven as well, an adjacent 47–story office tower. The terrorists flew the airplanes they hijacked directly into buildings One and Two, and the resulting fires consumed the two 102–story structures, causing them to collapse. Chunks of the collapsing buildings fell onto Seven, causing the fires to spread to that building, where they created another inferno, causing a collapse also of that building.

The plaintiff, Industrial Risk Insurers ("IRI"), insured the lessee of Seven World Trade Center ("7 WTC"), Silverstein Properties Inc. ("Silverstein"). Claiming rights as a subrogee to the extent of its payments to Silverstein, IRI sued the parties whose fault, it alleges, contributed to, or proximately caused, the collapse of 7WTC. IRI sued the airlines, the airport security companies, and the airplane manufacturer for allowing the terrorists to board and hijack the airplanes (04 Civ. 7231). And IRI

sued the Port Authority of New York and New Jersey ("PANYNJ" or the "Port Authority"), the owner of 7WTC, and Citigroup Inc. and Citigroup Global Market Holdings Inc. ("Citigroup"), the sublessee from Silverstein of portions of floors one through five, and of floors 28 through 47 of 7WTC (02 Civ. 7170), for gross negligence in maintaining, or allowing Citigroup to maintain, large stocks of diesel fuel in 7 WTC that intensified the fires that engulfed building number seven and made them impossible to extinguish.

IRI's action against the airlines, the airport security companies, and the airplane manufacture will be progressing on a separate track, with other property claims arising from the terrorist-related aircraft crashes of September 11, 2001. The other defendants in this case, The Port Authority and Citigroup, have moved to dismiss the complaint against them for failing to state a legally sufficient claim for relief. Fed.R.Civ.P. 12(b)(6). I held, at the argument of the motion on November 30, 2004, that, as to the Port Authority, there were issues of fact outside the complaint that required limited discovery, and I denied its motion without prejudice to renewal following such discovery. This Opinion treats the motion of Citigroup.

I hold that the covenants of Citigroup's lease with Silverstein and IRI's insurance agreement of Silverstein are to be incorporated into and read with the complaint, and that they bar IRI from proceeding as Silverstein's subrogee against Citigroup. Accordingly, IRI's complaint against Citigroup, Inc. and Citigroup Global Markets Holdings, Inc. is dismissed.

## I. IRI'S COMPLAINT

As Silverstein's subrogee, and to the extent it paid Silverstein for its insured losses with respect to 7WTC, IRI sues the Port Authority, as owner of 7WTC, and Citigroup, as sublessee of Silverstein, claiming that their gross negligence proximately caused the destruction of 7WTC.

IRI alleges that Silverstein acquired the land and air space rights to 7WTC in 1980 from the Port Authority and, in 1987, constructed a 47–story office tower. Salomon Inc. (later acquired by Citigroup) leased floors 28–47 and portions of floors 1–5, largely to operate a trading floor and sustain its trading operations, and built a pressurized diesel fuel system and nine high powered emergency generators, served by two 6,000 gallon fuel tanks and piping always filled with fuel, to ensure that a power outage would not interrupt its trading activities. IRI alleges that Citigroup "designed, constructed, installed and used an emergency generator system that utilized an unreasonable amount of diesel fuel and that continuously pumped that fuel unreasonably close to critical structural supports in the building without proper safeguards," (Pl.'s Am. Compl. ¶ 55) and that the Port Authority had design control and allowed the construction in violation of City ordinances, that the fuel tanks contributed to the intensity of the fires and inability to bring them under control and proximately caused the collapse of 7WTC in the afternoon of 9/11, and that both Citigroup and the Port Authority were guilty of gross negligence with respect to that design. The complaint cites a report of the United States Emergency Management Agency, "World Trade Center, Building Performance Study," finding that the building collapsed due to the failure of critical, non-redundant transfer trusses that were subjected to significant and prolonged fire heating fed by the diesel fuel stored in the tanks in the building. IRI alleges that its loss exceeded $75 million.

## II. LEGAL STANDARDS OF A MOTION TO DISMISS

In considering a motion to dismiss, a district court should construe the com-

plaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

■ In connection with this motion, the parties have submitted documents including lease and insurance agreements. For purposes of Rule 12(b), " 'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) (*quoting Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). Even where a document is not incorporated by reference, a court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint. *Int'l Audiotext,* 62 F.3d at 72. *Chambers v. Time Warner, Inc.* 282 F.3d 147, 152–53 (2d Cir.2002). IRI's complaint is based on its insurance agreement with Silverstein, and Silverstein's lease agreement with Citigroup. Thus, I have considered these documents in reaching my decision to grant Citigroup's motion, without objection by the parties.

## III. The Lease and Insurance Agreements

The lease agreement between Silverstein and Salomon Inc., effective November 23, 1988, provided specifically for Salomon's emergency generator system, with its two 6,000 gallon, diesel fuel tanks. Annexes to the lease described the design of the system, and subjected it to approvals of engineers of both Silverstein and the Port Authority. The parties also mutually released one another from liability. And, the parties involved the insurer, IRI, with regard to such risks, and negotiated provisions that allocated the risk of loss to IRI. The parties largely accept the clarity of this intent, and present arguments, not as to the proper interpretation of the lease and insurance agreements, but as to the public policy that should be applied. As will become clear, there is nothing in the public policy of the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 (2005) and New York law that should enable IRI to recover from Citigroup for losses from the risks that it knowingly agreed to assume.

The lease agreement gave Salomon the "exclusive right to install on the fifth floor . . . up to eleven 1750 KVA diesel emergency power generators . . .," and promised to "facilitate Tenant's exclusive access to emergency power generator diesel fuel capacity of not less than 12,000 gallons. . . ." Lease § 4.01, Exhibit C.V.D.3. Silverstein retained the right, within a ten-day period after submission of detailed plans, to disapprov[e] such Alterations. Lease § 14.03(c)(i). One stated ground for withholding approval was the potential for the alteration to "jeopardize the structural integrity of the Building." *Id.* Furthermore, the installation and placement of the fuel risers and fuel lines were to be made "subject to the Landlord's approval." Lease Exhibit C.V.D.5. The plans for alterations were to be reviewed by Silverstein's "architects, engineers or other consultants" § 14.03(d), and the lease required Salmon to reimburse Silverstein for the

costs of such review. *Id.*[1]

In view of the intimacy they acquired with respect to the emergency generator and fuel tank system, the parties mutually released each other to the extent each was insured under a policy containing permission to grant such release. Section 12.06(d) of the lease provided:

> Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage, or destruction with respect to its real or personal property ... occurring ... with respect and to the extent to which it is insured under a policy or policies containing ... permission to release liability.

This policy issued by IRI explicitly recognized this right of release. The insurance agreement provided, "[t]his insurance shall not be invalidated should the Insured waive by express agreement prior to a loss any or all right of recovery against any party for loss or damage insured against by this policy." And, further to enhance this provision, Salomon and Silverstein agreed in their lease to require their insurers to waive subrogation rights against the other:

> Landlord and Tenant shall each include in its insurance policies covering loss, damage or destruction by fire or other such peril in respect of the Building ... an express agreement that such policy shall not be invalidated if the insured waives before the casualty the right of recovery against any party responsible for a casualty covered by such policy .... § 12.06(b).

IRI's insurance agreement with Silverstein expressly recognized the release and waiver-of-subrogation clauses of the Salomon/Silverstein lease. Section IV.C provided:

> This insurance shall not be invalidated should the Insured waive by express agreement prior to any loss any or all right of recovery against any party for loss or damage insured against by this policy.

Citigroup moves to dismiss based on these provisions of the Silverstein lease and insurance agreements.

## IV. The Governing Law

■ New York law provides the governing law to measure IRI's claims. The Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 (2005) ("the Act") provides that all suits "for damages arising out of the hijacking and subsequent crashes" are federal causes of action. ATSSSA § 408(b). Section 408(b)(2) provides that the governing law for such lawsuits is to be "derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Because the crashes relevant to 7WTC occurred in New York, New York law is the governing law for plaintiff's lawsuit.

■ Though IRI alleges an action in tort, the motion before me relates to the validity of defenses relating to the clauses of the lease and insurance agreements among Citigroup, Silverstein, and IRI and the legal consequences of those clauses. This motion thus raises contract issues. New York's choice-of-law rules provide that "when determining which law to apply to a contract dispute, the court evaluates the center of gravity ... with the purpose

---

**1.** The "Three Party Agreement" between the PANYNJ, Salomon, and 7 WTC gave similar permission for installation of the emergency generators and contained similar clauses for review and approval by the PANYNJ.

of establishing which state has the most significant relationship to the transaction and the parties." *Specht v. Netscape Communications Corp.*, 150 F.Supp.2d 585, 590 (S.D.N.Y.2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002), (quoting *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 642 N.E.2d 1065, 618 N.Y.S.2d 609 (1994))). As I have noted in a previous September 11th case, when "the policy was negotiated and issued in New York by an authorized New York insurance company for properties within the state, New York clearly has 'the most significant relationship to the transaction and the parties.'" *In re September 11th Liability Ins. Coverage Cases*, 333 F.Supp.2d 111, 120 (S.D.N.Y.2004) (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 642 N.E.2d 1065, 618 N.Y.S.2d 609 (1994)).

Thus, the governing law for both claims and defenses is New York substantive law.

## V. IRI's CLAIMS AGAINST CITIGROUP ARE DERIVED FROM THE RIGHTS OF SILVERSTEIN, ITS INSURED, AND ARE SUBJECT TO CITIGROUP'S DEFENSES AGAINST SILVERSTEIN

### A. Silverstein's Release of Claims Against Citigroup

As subrogee, IRI has only the same claims that Silverstein could make. Thus, if Silverstein and Citigroup each have released the other, IRI's claim must be dismissed if Silverstein's claim against Citigroup would be released. *See U.S. Fidelity & Guar. Co. v. E.W. Smith Co.*, 46 N.Y.2d 498, 504, 387 N.E.2d 604, 606, 414 N.Y.S.2d 672, 674 (1979) ("It is the very essence of subrogation that a subrogee stands in the shoes of the subrogor.")

The Silverstein–Citigroup lease agreement provides that "[e]ach party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage, or destruction with respect to its real or personal property." Lease, § 12.06(d). Each party pursuant to the lease agreed to look to its own insurer for protection against loss, and each agreed to seek the consent of its own insurer to such release. The parties do not dispute that this combination of agreements—the release of liability in combination with an agreement between the parties to procure promises from insurers that such releases do not invalidate the policy—have the same effect as an explicit waiver of insurance rights by the insurance provider. The clause used in the lease is, in fact, identical to that in the Practising Law Institute's model lease as a model insurance clause and method of waiving subrogation. 461 PLI/Real 101, Practising Law Institute Real Estate Law and Practice Course Handbook Series, PLI Order No. N0–005H at 372, Section 42E, *Materials Reflecting Fundamental Business Terms for Office and Mixed Use Retail Projects: Negotiating Commercial Leases: How Owners and Corporate Occupants Can Avoid Costly Errors*, Fall 2000.

IRI argues that it would be against New York's public policy to apply the release clause of the lease to claims of gross negligence. The New York Court of Appeals has held that releases of claims for gross negligence are unenforceable, though the party seeking to enforce the agreement will have to meet a particularly high standard of gross negligence. *See Colnaghi U.S.A. Ltd. v. Jewelers Protection Services*, 81 N.Y.2d 821, 611 N.E.2d 282, 595 N.Y.S.2d 381 (1993). IRI has alleged that Citigroup was grossly negligent in locating two 6,000 gallon tanks filled with diesel fuel close to critical support elements of 7WTC, and that the collapse of the building proximately resulted from the feeding

of the fires emanating from buildings One and Two by the diesel fuel in the 7WTC tanks.

In *Colnaghi*, an alarm company contracted with an art gallery to install, maintain and monitor two burglar alarm systems. However, the alarm company failed to secure a skylight, and burglars broke into the gallery through the skylight and stole 20 paintings. The gallery sued the alarm company, but the alarm company, relying on clauses in its subscriber agreement exonerating it from liability for negligence, moved for summary judgment dismissing the complaint. *Id.*

■ The Court of Appeals granted the motion to dismiss. New York law, it held, generally enforces contractual provisions absolving a party from its own negligence. Although a party may not exonerate itself from liability from its own grossly negligent conduct, the conduct in question must differ "in kind, not only degree," from claims of ordinary negligence; the conduct must evince "a reckless disregard for the rights of others," or be of a kind that "smacks" of intentional wrongdoing. *Id.* at 824, 611 N.E.2d at 284, 595 N.Y.S.2d at 383 (*citing Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (1992)).

The Court of Appeals held that the art gallery's allegation that the alarm company was grossly negligent in failing to secure and arm the skylight failed to meet the high pleading standard of New York law for avoiding the consequences of such agreement. The Court of Appeals ruled that failure to wire a skylight, while perhaps suggestive of negligence or even "gross negligence," did not "evince the recklessness necessary to abrogate [the] agreement to absolve [the alarm company] from negligence claims." *Id.* at 824, 611 N.E.2d at 284, 595 N.Y.S.2d at 383.

■ The New York rule for the permissibility of waivers of liability is often stated in quite general terms. "To the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as wholly void." *Gross v. Sweet,* 49 N.Y.2d 102, 106, 400 N.E.2d 306, 424 N.Y.S.2d 365 (1979) (*citing* Restatement, Contracts, § 575; 15 Williston, Contracts (3d Jaeger ed.), § 1750A at 141.) *See also Colnaghi,* 81 N.Y.2d at 823–24, 595 N.Y.S.2d at 382–83, 611 N.E.2d at 283–84 (citations omitted) ("New York law generally enforces contractual provisions absolving a party from its own negligence.... Public policy, however, forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by 'grossly negligent conduct.'"); N.Y. Prac, Landlord and Tenant Practice in New York § 12:123 ("[A]n agreement may not release a party from willful or gross negligence."). However, the limitations on this rule are readily apparent.

First, the *Colnaghi* rule itself contains the limitation noted above; that the "gross negligence" claims protected by this rule "differ[ ] in *kind,* not only in degree, from claims of ordinary negligence." *Colnaghi,* 81 N.Y.2d at 823–24, 595 N.Y.S.2d at 382–83, 611 N.E.2d at 283–84 (emphasis added). New York courts applying the *Colnaghi* rule take this distinction seriously. For example, the First Department declared that "the failure to properly maintain, in working order, a video camera overseeing the safety deposit boxes in which plaintiff stored its jewelry, while clearly negligent, and *even grossly negligent as used in other contexts,* did not meet [the *Colnaghi* standard]." *Stuart Rudnick, Inc. v. Jewelers Protection Services, Ltd.,* 598 N.Y.S.2d 235, 236 194 A.D.2d 317, 317 (1st Dep't 1993) (emphasis added). *See also, Lubell v. Samson Moving & Storage, Inc.,* 307 A.D.2d 215, 763

N.Y.S.2d 30 (1st Dep't 2003) (enforcing a release of liability where "there is no indication that defendant's negligence, if any, 'differed in kind' from acts of ordinary negligence."); *Ninacci Diamond & Jewelry Co. v. Miller Freeman, Inc.,* 722 N.Y.S.2d 519, 519–20, 281 A.D.2d 342 (1st Dep't 2001) (holding that defendant's actions "may be indicative of negligence [but] they do not evince the recklessness necessary to abrogate the exculpatory clause in the parties' agreement."); *St. Patrick's Home for the Aged and Infirm v. Laticrete Int'l, Inc.,* 700 N.Y.S.2d 28, 30, 267 A.D.2d 166, 167 (1st Dep't 1999) ("Plaintiff has not alleged any wanton indifference on the part of appellant that 'evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.' "). Ordinary mistakes or miscalculations in performing a task will not meet this standard. For example, the New York Court of Appeals has held that an expert opinion that the defendant alarm company should have installed additional motion detectors and a shock sensor failed to raise an issue of fact regarding gross negligence. *David Gutter Furs v. Jewelers Protection Servs., Ltd.,* 79 N.Y.S.2d 1027, 1029, 594 N.E.2d 924, 924, 584 N.Y.S.2d 430 (1992).

A case from the Second Department demonstrates that New York courts are unwilling to let cases with releases of liability go to a jury on the issue of gross negligence simply because the plaintiff has added a conclusory allegation of gross negligence to a cause of action. The plaintiff sued defendant burglar alarm company, whom it had released from claims of negligence and breach of contract, for damages allegedly incurred as a result of two burglaries that occurred during the time of the contract with the defendant. Although the short opinion does not detail the specific conduct that plaintiff alleged was grossly negligent, the court held that there were no triable issues of fact that would amount to gross negligence, and held that "the plaintiff did not allege conduct by [defendant] which rises to the level of gross negligence." *Aphrodite Jewelry Inc. v. D & W Central Station Alarm Co. Inc.,* 681 N.Y.S.2d 305, 307, 256 A.D.2d 288, 289 (2d Dep't 1998). The First Department has held that "[d]elayed or inadequate response to an alarm signal, without more, is not gross negligence." *Hartford Insurance Co. v. Holmes Protection Group,* 673 N.Y.S.2d 132, 133, 250 A.D.2d 526, 528 (1st Dep't 1998). The *Hartford* court emphasized that "a triable issue of 'gross negligence' is not typically found absent more outrageous acts of folly." *Id* at 133, 250 A.D.2d at 528.

The purpose, then, of excepting claims of gross negligence from the rule permitting the release of claims for negligence, is to ensure that parties will have legal recourse for injuries from particularly malicious behavior. The rule exists to protect parties in positions of weaker bargaining power from unknowingly agreeing in advance to allow the other party to recklessly disregard its rights in broad and unforeseeable ways. However, parties, especially those of equal bargaining power, should be able to rely upon the general New York rule that enforces contracts for the release of claims of liability. If a party needs only to add gross negligence as a theory of liability to force litigation to proceed through discovery and a trial, contracting parties would be stripped of the substantial benefit of their bargain, that is, avoiding the expense of lengthy litigation.

Federal courts applying New York law have consistently applied the higher standard of "reckless disregard" in cases where a party seeks to pursue a claim of gross negligence despite a release of liability. *See, e.g., Net2Globe Int'l Inc. v. Time Warner Telecom of New York,* 273 F.Supp.2d 436, 451 (S.D.N.Y.2003) (citing

*Colnaghi* to support a dismissal on summary judgment of a gross negligence claim concluding that there was no triable issue of fact as to gross negligence); *Metropolitan Property & Casualty Insurance Co. v. Budd Morgan Central Station Alarm Co., Inc.,* 95 F.Supp.2d 118, 122 (E.D.N.Y.2000) (under New York law, "generally, no issue of gross negligence is raised where the claim is based upon either inappropriate installation of an alarm system or an inappropriate response to an alarm."); *Charter Oak Fire Insurance Co. v. Trio Realty Co.,* 2002 WL 123506 at *7 (S.D.N.Y.) ("[T]he landlord's failure to inspect a premises before turning it over to a tenant in the same line of work as the prior tenant does not rise to the level of gross negligence described by the New York cases."); *Ninacci Diamond & Jewelry Co. v. R.A.V. Investigative Services, Inc.,* 1998 WL 299926 at *5–7 (S.D.N.Y.) (failure to discover and arm a point of entry into a storage room does not rise to the *Colnaghi* gross negligence standard).

Accordingly, I hold that IRI has not stated a claim for gross negligence. Although, in other circumstances, the rule of liberal pleading requiring no more than "a short and plain statement of [a] claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), would suffice to defeat a motion to dismiss make "it appear[ ] to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Id.* (discussing *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[2]

### B. IRI's Claim is Barred Because Silverstein Assumed the Risks Posed by Citigroup's Emergency Generator and Diesel Fuel Tank System

IRI's tort claim also fails because, under New York law, Silverstein assumed the risk of the injury and Citigroup thus does not owe Silverstein a duty of care.

IRI, as Silverstein's subrogee, derived its right to make claim from Silverstein; it succeeded to Silverstein's rights and interests and to Silverstein's disabilities. *See U.S. Fidelity & Guar. Co. v. E.W. Smith Co.,* 46 N.Y.2d 498, 504, 387 N.E.2d 604, 606, 414 N.Y.S.2d 672, 674 (1979) ("It is the very essence of subrogation that a subrogee stands in the shoes of the subrogor.") Since Silverstein's lease agreement with Citigroup makes it clear that Silverstein knew about and accepted the risks posed by Citigroup's emergency generator and diesel fuel system, Silverstein must be considered to have assumed the risks presented by that system. Thus, Citigroup argues, IRI is barred from suing Citigroup for damages arising from the risks it assumed.

Citigroup's emergency generator and diesel fuel system was a principal subject of the lease agreement between Salomon (Citigroup's predecessor) and Silverstein. Thus, the lease specifically provided for the emergency generator and diesel fuel system, and described its size, fuel capacity, design and location in 7WTC. The lease gave Salomon the "exclusive right to install on the fifth floor ... up to eleven 1750 KVA diesel emergency power generators ...," with "diesel fuel capacity of not less than 12,000 gallons...." Lease,

---

**2.** New York courts have dismissed similar complaints at the motion to dismiss level. *See e.g., Retty Financing, Inc. v. Morgan Stanley Dean Witter & Co.,* 293 A.D.2d 341, 740 N.Y.S.2d 198. 293 A.D.2d 341, 740 N.Y.S.2d 198 (1st Dep't 2002) (allegations set forth in

the complaint fail to meet the *Colnaghi* standard for gross negligence): *Sutton Park Development Corp. Trading Co. Inc. v. Guerin & Guerin Agency, Inc.,* 297 A.D.2d 430, 745 N.Y.S.2d 622 (3d Dep't 2002).

§ 4.01, Exhibit C.V.D.1, .3. The system was integral to Salomon's extensive trading operations, and protected its trading floor against the risk of electrical shutdowns.

The lease gave Silverstein the right to have its architect, engineers and technical consultants review Salomon's system. If, in the opinion of Silverstein's experts and advisors, the system might "jeopardize the structural integrity of the Building," Silverstein had the right to disapprove the system. Lease § 14.03(c)(i). Salomon was required to reimburse Silverstein for the costs of Silverstein' review. *Id.*

Clearly, Silverstein was intimately involved with the design and implementation of the emergency backup generator system. The parties made their business decisions in light of Salomon's need for such a system, Silverstein's review of its feasibility and safety, and the commercial reflection of the parties' interests in the rental and other commercial terms and conditions of the lease.

New York recognizes two doctrines of assumption of risk: express and implied. Express assumption of risk is based on an express contract, an "agreement in advance that defendant ... would not be liable for the consequence of conduct that would otherwise be negligent," or "which, for whatever reason, the law deems blameworthy." *Arbegast v. Bd. of Educ. of South New Berlin Central School,* 65 N.Y.2d 161, 168–69, 480 N.E.2d 365, 370–71, 490 N.Y.S.2d 751, 756–57 (1986). Implied assumption of risk arises when the plaintiff "voluntarily encounter[s] the risk of harm from defendant's conduct with full understanding of the possible harm." *See Arbegast,* 65 N.Y.2d at 164, 169, 490 N.Y.S.2d 751, 480 N.E.2d 365 (adopting the common law definition of implied assumption of risk, and citing treatises: Prosser, Law of Torts, at 442 (4th ed.);

Schwartz, Comparative Negligence § 9.2; Comparative Negligence Law & Practice § 4.20(1)(b)(i) (Matthew Bender); Restatement (Second) of Torts § 496(b)). Implied assumption of risk can be either a complete defense, totally negating a duty to the claimant, or a partial defense, diminishing a recovery "in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages." N.Y.C.P.L.R. § 1411 (McKinney's 2004). An implied assumption of risk can diminish a *recovery* or, in appropriate cases, negate a recovery, similarly to an express assumption of risk. See *Turcotte v. Fell,* 68 N.Y.2d 432, 438, 502 N.E.2d 964, 968–69 510 N.Y.S.2d 49, 53–54 (1986) (necessary and proper, when measuring a defendant's duty to a plaintiff, to consider the risks assumed by the plaintiff).

In *Arbegast,* the plaintiff was a participant in a game of basketball played while riding donkeys, and was permanently injured when her donkey threw her and caused her to fall. The New York Court of Appeals held that this was an instance of express assumption of risk because the plaintiff had "testified that she was informed by defendant's employee prior to her participation that she participated at her own risk." 65 N.Y.2d at 162, 480 N.E.2d at 366, 490 N.Y.S.2d at 752. That is, the plaintiff consented to the conduct involved, and knew the risks of that conduct. Thus, the two criteria for express assumption of risk were satisfied by plaintiff: she "voluntarily encounter[ed] the risk of harm from defendant's conduct" and did so with a "full understanding of the possible harm to himself or herself." *Id.* 65 N.Y.2d at 169, 490 N.Y.S.2d at 757, 480 N.E.2d at 371.

It is clear that Silverstein entirely "encountered" the risks presented by Citigroup's emergency generator and diesel

fuel tanks system. The many clauses of the lease fully describing the system, Silverstein's reservation of right to examine the system using his technical experts and consultants and taking due regard for its size, capacity, and placement within 7WTC, and Silverstein's right to disapprove the system proposed by Citigroup for its potential to "jeopardize the structural integrity of the Building," make clear how thoroughly Silverstein "encountered" the risks of the diesel fuel system, and had "full understanding of the possible harm" it posed to the building. *See Arbegast,* 65 N.Y.2d at 169, 490 N.Y.S.2d 751, 480 N.E.2d 365; Lease, § 4.01, Ex. C.V.D. When a party estimates the risks it encounters, it is not necessary that the consenting party foresee "the exact manner in which the injury [would] occur[ ]" so long as it was "aware of the mechanism from which the injury arose." *Costanza v. State,* 151 Misc.2d 703, 707, 574 N.Y.S.2d 251 (1991). Silverstein was thus not required to foresee the exact chain of events, or the extraordinary circumstances of the terrorist related aircraft crashes. Silverstein's intimate acquaintance with Citigroup's emergency generator and diesel fuel system, its right through experts and consultants thoroughly to review that system, and its right to disapprove the system for its potential to "jeopardize the structural integrity of the building," Lease, § 14.03(c)(i) and Exs. C.V.D.1, 3, constituted an assumption of risk "in the context of the risks inherent in the act which [plaintiff] engaged in." *Morgan v. State,* 90 N.Y.2d 471, 486, 685 N.E.2d 202, 209, 662 N.Y.S.2d 421, 428 (1997). Silverstein's assumption of risk amounted to "a *principle of no duty,* or no negligence and so *denies the existence of any underlying cause of action." Id.* (emphasis in original) (internal quotations omitted).

Silverstein thus assumed the risks posed by Citigroup's system, and Silverstein and Citigroup expressly covenanted, in light of those risks, to release the other for "loss, damage, or destruction" "to the extent to which it is insured under a policy or policies containing ... permission to release liability," Lease, § 12.06(d), § 14.03.

The doctrine of assumption of risk, is not limited, as IRI argues, to participants in sporting events. *Turcotte* and *Arbegast* have been applied to other situations involving claims for property damage as well as for personal injury. *See, e.g., Costanza v. State,* 151 Misc.2d 703, 574 N.Y.S.2d 251 (1991); *Mafoud v. City,* 606 N.Y.S.2d 309, 200 A.D.2d 561 (2d Dep't 1994); *Westerville v. Cornell Univ.,* 737 N.Y.S.2d 389, 291 A.D.2d 447 (2d Dep't 2002).

■ Accordingly, IRI is barred from suing Citigroup because its subrogee, Silverstein, assumed the risks posed by Citigroup's emergency generator and diesel fuel tank system.

## VI. IRI's Waiver of Subrogation

Pursuant to their lease agreement, Silverstein and Citigroup mutually released each other from liability, and each agreed to obtain insurance that accepted the mutual releases and waived subrogation rights. Section 12.06(d) of the lease provides that "[e]ach party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage, or destruction with respect to its real or personal property." Section IV.C of IRI's insurance agreement with Silverstein, entitled "Subrogation," provided:

This insurance shall not be invalidated should the Insured waive by express agreement prior to any loss any or all right of recovery against any party for loss or damage insured against by this policy.

Parties to commercial leases often provide for waivers of subrogation rights, and these sorts of arrangements are enforceable in New York. *Kaf–Kaf, Inc. v. Rodless Decorations,* 90 N.Y.2d 654, 665 N.Y.S.2d 47, 687 N.E.2d 1330, (1997). In that case, Kaf–Kaf leased two floors of a building from Rodless. The standard-form lease contained a waiver of subrogation clause. After a fire of unknown origin, Kaf–Kaf's insurer paid the claim, and instituted a subrogation claim against Rodless for its negligence in maintaining the sprinkler system. In response, Rodless's insurer instituted a subrogation action against Kaf–Kaf also alleging negligence. The trial court dismissed both actions based on the waiver of subrogation clause, and the Court of Appeals affirmed the dismissal, holding that agreements for waiver of subrogation are enforceable. *Id.*

However, *Kaf–Kaf* concerned the dismissal of a subrogated case based on a claim of negligence. The question advanced by IRI is whether or not a claim based on gross negligence—the allegation made by IRI—should be similarly affected. Since there is no ruling of the New York Court of Appeals directly on point, my task is to ascertain what the highest court would do if faced with that question, giving " 'proper regard' to the relevant rulings of other courts of the State." *Commissioner of Internal Revenue v. Bosch's Estate,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

In *Federal Ins. Co. v. Honeywell, Inc.,* 663 N.Y.S.2d 247, 248, 243 A.D.2d 605 (2d Dep't 1997), an insurer paid an indemnification for its insured's loss, but was unable to recover its payment through subrogation because of the insured's gross negligence. The insurer then sought to recover the payment it had made to its insured, claiming that a waiver of subrogation violated public policy if it were to apply to a loss resulting from gross negligence The Appellate Division, in a brief decisions, dismissed the insurer's claim. I believe that the New York Court of Appeals would hold similarly.

It is permissible in New York to secure insurance that protects against loss resulting from conduct that exceeds ordinary negligence. Thus, insurers are required to defend claims alleging that the insured engaged in reckless and wanton or willful conduct. *Public Service Mut. Ins. Co. v. Goldfarb,* 53 N.Y.2d 392, 425 N.E.2d 810, 442 N.Y.S.2d 422 (1981). *See also State Farm Mutual Automobile Ins. Co. v. James Van Dyke,* 668 N.Y.S.2d 821, 823, 247 A.D.2d 848, 849 (4th Dep't 1998) ("reckless and careless conduct falls within the policy's coverage."); *see also Nat'l Union Fire Ins. Co. v. City of Oswego,* 744 N.Y.S.2d 266, 268, 295 A.D.2d 905, 906 (4th Dep't 2002) ("The allegations of reckless conduct fall within the policy coverage."); *Teska v. Atlantic National Insurance, Co.,* 59 Misc.2d 615, 300 N.Y.S.2d 375 (1969) ("[I]t is not against public policy to require the insurance company to be liable for damages as a result of reckless, wanton or willful acts of the insured."). If reckless and willful conduct can be insured, surely grossly negligent conduct can be insured.

New York public policy does not allow a party to release himself of claims based on his gross negligence, though the gross negligence alleged must "smack[ ] of intentional wrongdoing." *Colnaghi U.S.A. Ltd. v. Jewelers Protection Services,* 81 N.Y.2d 821, 611 N.E.2d 282, 595 N.Y.S.2d 381 (1993). A party cannot insure against having to pay an assessment of punitive damage, *Home Insurance Co. v. American Home Products Corp.,* 75 N.Y.2d 196, 201, 550 N.E.2d 930, 933, 551 N.Y.S.2d 481, 484 (1990). However, these decisions do not undercut the basic rule that a party may be compensated through

insurance for its own gross negligence. The New York Court of Appeals has expressly upheld such policies, holding that a prohibition on policies covering punitive damages for gross negligence does *not* extend to policies covering ordinary compensatory damages for gross negligence. *Public Service Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 400–01, 425 N.E.2d 810, 814–15, 442 N.Y.S.2d 422, 428 (1981).

The reasoning behind permitting insurers to waive subrogation rights evinces a different public policy than the reasoning prohibiting insureds to release claims against them for gross negligence. Waivers of subrogation are not seen as an instrument for the mutual release of claims. Rather, subrogation waivers "reflect[ ] the parties' intention to look first to their insurers for recovery of losses." *Kaf–Kaf*, 90 N.Y.2d at 660, 687 N.E.2d at 1332–33, 665 N.Y.S.2d at 49–50. In such situations, the mutual agreement to procure insurance ensures that the injured party will have a source of recovery. That policy would be defeated if one party could simply pass along the costs to its insured.

■ IRI urges that the same reasons of public policy that prohibit people from being released against claims based on their reckless disregard for the rights of others, *see Colnaghi*, 81 N.Y.2d at 823, 595 N.Y.S.2d 381, 611 N.E.2d 282, should prohibit waivers of subrogation for such conduct. In other words, according to IRI, the public policy should require a defendant *always* to pay for its own acts of gross negligence. Apart from IRI's misstatement of the rule in *Colnaghi*, as discussed earlier in this opinion, IRI also misstates the holding of the New York Court of Appeals as to a party being able to insure against its own gross negligence. The New York Court of Appeals held that "[w]here no finding of an intent to *injure* has been made, nothing in the public policy

of this State precludes indemnity for compensatory damages flowing from a defendant's volitional act." *Public Service Mut. Ins. Co.*, 53 N.Y.2d at 400–01, 442 N.Y.S.2d 422, 425 N.E.2d 810. In other words, the focus of New York public policy with respect to gross negligence claims lies with ensuring that there not be an impediment against the right of a plaintiff to recover, *not* with ensuring that the defendant will not be able to obtain insurance against the risk of his tortious conduct and its impact on others. As the Court of Appeals in another case ruled, "[a] distinction must be drawn between contractual provisions which seek to exempt a party from liability to persons who have been injured . . . and contractual provisions . . . which in effect simply require one of the parties to the contract to provide insurance for all the parties." *Board of Education v. Valden*, 46 N.Y.2d 653, 657, 416 N.Y.S.2d 202, 389 N.E.2d 798 (1979) (upholding a waiver of subrogation clause in an ordinary negligence claim). *See also St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 317 F.Supp.2d 336, 341 (S.D.N.Y. 2004) ("To an injured party, it is irrelevant whether it recovers from the grossly negligent party or from an insurer. This rule, thus, does not bear on the lawfulness of a clause affecting an *insurer's* right to recover from a party who was grossly negligent.").

■ The New York Court of Appeals has reasoned, that "[s]ince the insurance contract in issue expressly provides coverage for such volitional acts . . . *the insurer must be held to the bargain which it struck with the insured,* absent an express reservation or exclusion to the contrary." *Public Service Mut. Ins. Co.*, 53 N.Y.2d at 400–01, 442 N.Y.S.2d at 426–27, 425 N.E.2d at 814–15 (emphasis added). IRI, Silverstein, and Citigroup are all sophisticated business entities, and I find that

New York public policy would favor holding such parties to the term of their bargain when the alleged tort victim has received its compensation, as Silverstein has here.[3]

Judge Kimba M. Wood applied the New York rule permitting such a waiver in *St. Paul Fire and Marine Insurance Company v. Universal Builders Supply*, 317 F.Supp.2d 336, 341 (S.D.N.Y.2004). The case concerned the collapse of a 49-story scaffolding structure during the construction of 4 Time Square. The contract between the owners and the construction company contained a waiver of a right of recovery and a promise to procure insurance with waivers of subrogation. The insurance policies contained waiver of subrogation clauses. The insurance company then sued the construction company for gross negligence, seeking to avoid the subrogation waiver and underlying releases. *Id.* at 338–39. Judge Wood noted that, "[t]o an injured party, it is irrelevant whether it recovers from the grossly negligent party or from an insurer," *Id.* at 341. The contracts reflected an "unambiguous intention to prevent actions such as this one," *id.*, and permitting the lawsuit "would have the detriment of encouraging litigation among parties to complicated construction contracts." Having examined the New York cases, Judge Wood concluded that "New York law *does* permit" waivers of subrogation of gross negligence. *Id.* I agree with her reading of New York law and, as she did, consider district court holdings to the extent they are contrary.

The three federal cases that held the opposite, in my opinion, are unpersuasive. In *American Motorist Ins. Co. v. Morris Goldman Real Estate Corp.*, 277

F.Supp.2d 304 (S.D.N.Y.2003), for example, the district court failed to recognize the public policy distinction drawn by the New York Court of Appeals discussed above, between protecting victims and honoring business agreements between the insurer and the insured. *See St. Paul Fire and Marine Insurance Co.*, 317 F.Supp.2d at 341. A second case, *Travelers Ind. Co. v. Losco Group, Inc.*, 204 F.Supp.2d 639 (S.D.N.Y.2002), the district court followed a brief decision of the Appellate Division, *Federal Ins. Co. v. Honeywell, Inc.*, 243 A.D.2d 605, 663 N.Y.S.2d 247 (2d Dep't 1997), which also failed to recognize the distinction drawn by the New York Court of Appeals. The Appellate Division observed that "[i]t is the law in New York that claims for gross negligence are *not* precluded by waivers of subrogation provisions." *Losco*, 204 F.Supp.2d at 644. *Honeywell* does not hold the way the district court cited it, for it dealt with the deductible part of the insurance, that which the insurance company was entitled, in any event, to recover from the insured.

> *Honeywell* in fact holds exactly the opposite.... [It] held that the insurance company could still sue the defendant for the insurance policy deductible (a sum that was not covered by the policy and that therefore was not covered by the waiver of subrogation).
>
> *St. Paul Fire and Marine Insurance Company*, 317 F.Supp.2d at 341 n. 13.

Accordingly, I hold that IRI must be held to the covenant it gave Silverstein when it issued its insurance policy, that it would indemnify Silverstein against loss and not look to any subrogation rights against Silverstein's tenant.

---

3. Other states encountering this same issue also waivers of subrogation for gross negligence. *See Behr v. Hook,* 173 Vt. 122, 787

A.2d 499 (2001); *Agra–By–Products, Inc. v. Agway, Inc.,* 347 N.W.2d 142 (N.D.1984).

## VII. CONCLUSION

For the reasons stated in this opinion, IRI's complaint against Citigroup is dismissed with prejudice.

SO ORDERED.